UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LYNETTE DUVALL,

                                    NO. CIV. S-08-651 LKK/GGH

        Plaintiff,

    v.
                                    O R D E R

RELIANCE STANDARD LIFE
INSURANCE COMPANY and
DOES 1 to 100,

        Defendants.
_____/

    Plaintiff has brought suit under the Employee Retirement Income Security Act (ERISA) seeking review of the insurance claim administrator's determination of her entitlement to benefits. The parties have cross-moved for judgment under Federal Rule of Civil Procedure 52. The court resolves the motion on the papers and after oral argument. For the reasons stated herein, the court grants defendant's motion and denies plaintiff's.

////

////

////

1

1                              **I. FACTS**[1]

2    **A.   Defendant's Long-Term Disability Plan**

3         Plaintiff was a registered nurse employed by Marshall Medical

4    Center and insured through her employer for group disability

5    coverage by defendant.  ICR at 234-35, 238. Among other things, the

6    plan provided income replacement for eligible persons upon "total

7    disability from sickness or injury." Id. at 238. "Total disability"

8    is given a specific definition in the plan. First, it only

9    encompasses disability arising from "injury or sickness."  Id. at

10   246. Where a total disability is "caused by or contributed to by

11   mental or nervous disorders," the claimant is only entitled to

12   benefits for twenty-four months, unless the claimant is in a

13   hospital or institution at the end of that time. Id. at 257. These

14   include depressive disorders and anxiety disorders.  Id.

15        Second, the definition of "total disability," for purposes of

16   benefit eligibility, changes over time. The policy provides that

17   "for the first 24 months for which a Monthly Benefit is payable,"

18   the claimant is totally disabled if, as a result of sickness or

19   injury, the claimant "cannot perform the material duties of his/her

20   regular occupation." Id. at 247. After the first 24 months, a

21   claimant will only be considered totally disabled if he or she

22   "cannot perform the material duties of any occupation. . . that the

23   ──────────────────

24        [1]The facts described herein derive from the lodged insurance
     company's record. ("ICR").  The court uses the phrase Insurance
     Companies' Record, rather than Administrative Record, although
25   Administrative Record has become customary in the field, because
     it suggests an independent record, which is false characterization
26   of both the documents and their review.

[i]nsured's education, training, or experience will reasonably allow" Id.

**B.   Plaintiff's Claim**

   **1.   Claim Documents Submitted By Plaintiff**

   On May 6, 2005, plaintiff filed a claim for total disability, stating that it was based on "exacerbated long term chronic low back pain with stiffness and muscle spasms" and that she was "unable to perform job requirements, extreme emotional distress 2° to this." Id. at 273; see also id. at 275 (stating that she ceased working at Marshall Medical Center due to inability "to perform duties required to worsening low back pain and extreme emotional stress"). She stated that her injury had occurred over time, resulting in a discectomy in 1998, and that she had experienced a "gradual decline since 2000." Id. She reported that she was last able to work on November 12, 2004.[2] Id. She listed Dr. Stephen Cyphers and Dr. Paul Sobelman as doctors who had treated her for the disabling condition. Id. at 276.

   Her claim was supported by statements by three health care providers, Dr. Cyphers, Dr. Sobelman, and Brian Smith. Id. at 503-504, 583-86. Dr. Sobelman listed plaintiff's primary diagnosis as "diskogenic low back pain" and stated that secondary conditions contributing to the disability were "situational anxiety, depression." Id. at 503-504. He stated that plaintiff's condition was work-related because "physical activities cause increased back

   [2]On the claim form she wrote, "November 12, 2005," which appears to be an error in the year. See AR at 234.

1  pain, increased emotional stress." _Id._ at 503. He referred

2  plaintiff to Brian Smith for counseling. _Id._

3        Brian Smith, a licensed clinical social worker, also submitted

4  a statement in support of plaintiff's claim. He diagnosed plaintiff

5  as having depressive disorder, with the secondary condition of back

6  injury and chronic pain. _Id._ at 585. He stated that her condition

7  was work-related because it created "contributory stresses." _Id._

8        Finally, Dr. Cyphers, an orthopedist, gave plaintiff the

9  primary diagnosis of "chronic low back pain" with secondary

10 conditions of bowel problems. _Id._ at 583. Both Dr. Cyphers and

11 Sobelman indicated that for an eight-hour period, plaintiff could

12 perform sedentary work. _Id._ at 504, 583.

13        **2.   Defendant's Claim Decision**

14        In review of the claim, defendant requested the three doctors

15 provide copies of all medical treatment documents for the

16 plaintiff. _Id._ at 179-83. There are several items in the record

17 that were apparently provided in response.

18        In October 2003, Dr. Sobelman received a letter from Dr. Rajiv

19 Pathak, a neurologist, who had seen plaintiff for a "followup."[3]

20 _Id._ at 559. He reported plaintiff having "cognitive difficulty"

21 that was "slowly improving." _Id._ He performed an MRI and a spinal

22 tap on her and all results were normal. _Id._ He concluded that there

23 was no apparent neurological explanation for her "difficulty." _Id._

24 _____

25        [3]The letter does not reveal what this is a follow-up for and
   neither party has directed the court to evidence in the record
26 explaining the referral to Dr. Pathak.

4

1

2    In August 2004, Dr. Cyphers performed an "intense and thorough
3    workup" on plaintiff, who complained of lower back pain and
4    incontinence. Id. at 557-58. He concluded that she had chronic
5    lower back pain that may have "a significant postural component."
6    Id. at 558. He recommended a pelvic MRI and perhaps physical
7    therapy. Id.

8    The next month, she was admitted to Marshall Medical Center
9    after she fainted at home. Id. at 554. The treating physician
10   recommended a "tilt table test," id. at 555-56, but neither party
11   has directed the court to anything in the record showing the
12   results of that test, if given.

13   On November 19, 2004, approximately a week after plaintiff
14   filed her claim with defendant, Dr. Cyphers sent a letter to Dr.
15   Sobelman stating that he had seen plaintiff "over the last three
16   months" to treat her back pain, the symptoms of which had been
17   increasing. Id. at 549. On the day of the letter, Dr. Cyphers had
18   seen plaintiff and their discussion had "revealed some significant
19   social issues and possible depression." Id. He informed Dr.
20   Sobelman that he had referred plaintiff back to him for treatment
21   and possible medication. Id.

22   On December 10, 2004, Dr. Cyphers saw plaintiff again "for
23   review of back pain." Id. at 544. He noted that plaintiff had
24   experienced some improvement from physical therapy, however she
25   "still [felt] her back pain is significant enough that she would
26   be unable to return to work and function adequately." Id. He stated

that he discussed with plaintiff concerns she had raised about her job and encouraged her "to look for alternative employment where she is not required to work at such a fast pace and be responsible for so many patients at one time." Id. Dr. Cyphers also observed that plaintiff "will also be unable to do significant lifting because of her back history and degenerative changes." Id. He concluded that his impression of her condition was that plaintiff had "chronic mechanical low back pain," improved "midthoracic pain," and "significant social issues related to disability." Id.

On January 6, 2005, plaintiff saw an unidentified doctor at Sierra Foothill Family Medical Associates for "[follow-up for] back pain." Id. at 521. The handwritten notes indicate that plaintiff was "feeling better on Wellbutrin, less stressed, [higher] energy this week." Id. She was assessed as having depression and situation anxiety. Id.

On February 14, 2005, Dr. Cyphers again saw plaintiff for her back pain. Id. at 490. He concluded that she had experienced some improvement in her pain and that "Wellbutrin has helped her overall outlook." Id. He noted that she had stayed off from work because her nursing duties were too physically demanding. Id.

On July 11, 2005, Smith faxed a letter to defendant in response to its request for records. Id. at 506-508. In sum, he described having treated plaintiff at two intervals -- in 2001 and 2004-2005 -- for anxiety and depression related to her time working in Africa and diagnosed her as having an "adjustment disorder with depression and anxiety with . . . a Post-traumatic component." Id.

6

He concluded, "the cumulative effect of these experiences . . . lead [him] to conclude that [plaintiff] is permanently disabled." Id. at 507.

That day, defendant's examiner completed a medical and vocational review of plaintiff's claim. Id. at 485. A review of the plaintiff's medical records provided to date led the nurse reviewer to conclude,

> Claimant with low back pain but that does not appear to be the primary impairing condition. Claimant's impairment based on records is due to depression / anxiety / nightmares and flashbacks related to PTSD related to time spent nursing in Africa. Claimant's psychiatric condition precludes her from acute care nursing but would not appear to preclude other forms, such as office nursing, utilization review etc.

Id. at 485.[4]

Nonetheless, defendant approved plaintiff's claim on August 26, 2005, retroactive to May 12, 2005. Id. at 171-72. In the approval letter, defendant reiterated the portion of the policy relating to disability benefits for a disability caused or contributed to by a mental disorder. Id. It advised her that, based on the information provided in her claim application, her eligibility for benefits was limited by that provision and therefore her benefits would terminate in twenty-four months, in

---

[4]It is difficult to give credence to this conclusion since various treating physicians found that the back pain was disabling and the depression, etc. was related to her disability. Indeed, the conclusion raises concerns whether defendant's conduct was arbitrary and capricious. The fact that a nurse, who had never seen plaintiff, was reviewing a treating doctor's records but reaching a different conclusion adds to the court's concern.

7

1  May 2007.[5] <u>Id.</u>

2      In September 2005, defendant asked to have plaintiff evaluated

3  by a Vocational Consultant. <u>Id.</u> at 317. The consultant reviewed

4  plaintiff's claim file and interviewed her by phone. <u>Id.</u> at 311.

5  Based on the conversation, he concluded that it was unclear whether

6  plaintiff was able to return to work due to her physical and

7  psychological difficulties, but that her "well developed nursing

8  skill sets, even at a sedentary level, would appear quite

9  consistent with a variety of related titles such as director of a

10 nursing registry, advice nurse, quality assurance, utilization

11 review, etc." <u>Id.</u> at 315-16.[6]

12 **C.   Discontinuation of Plaintiff's Benefits**

13     In March 2006, defendant notified plaintiff that her benefits

14 would end in May of the next year. <u>Id.</u> at 75. The letter advised

15 that this was because, per the terms of the policy, disability

16 benefits would not be paid for more than twenty-four months for

17 disability caused or contributed to by a mental disorder unless she

18 was hospitalized at the end of the twenty-four month period and

19 disability benefits would not extend past twenty-four months when

20 the claimant was capable of performing her "regular occupation."

21 <u>Id.</u> A "regular occupation," the letter explained, "is not your job

22 _____

23      [5]There is evidence in the record that plaintiff also had
   applied for Social Security benefits, which were granted beginning
24 May 2005.

25      [6]Under the policy, apparently there was no requirement that
   such jobs actually be available and thus no assessment of their
26 availability was made.

1  with a specific employer, in a particular work environment, nor is

2  it your specialty in a particular occupational field. . . . [W]e

3  must evaluate your inability to perform your own regular occupation

4  as it is performed in a typical work setting for any employer in

5  the general economy." Id. at 76. The letter reviewed the medical

6  documents it had received for plaintiff in light of the fact that

7  nursing is considered "medium level" in terms of the amount of

8  physical work it requires. Id. Relying on Smith's statements, it

9  concluded that plaintiff had originally left work due to depression

10  and anxiety. Id. Upon consideration of Smith and Cypher's records,

11  defendant concluded that plaintiff "would be precluded from work

12  in an acute care nursing setting, but not from duties such as

13  office nursing, utilization review, etc." Id. Therefore, plaintiff

14  could continue to perform "medium level" work, precluding her from

15  receiving benefits past the twenty-four month mark. Id.

16      The letter also described the process to appeal the

17  determination. Id. at 77. Among other provisions, the letter stated

18  that an appeal must be filed within 180 days, from which time a

19  response would be issued in forty-five days or, if there were

20  "special circumstances," sixty days. Id.[7]

21  ////

22  ////

23  _____

24      [7]Once again, the use of appeal suggests an independent body
   reviewing the file, while in truth, of course, all that plaintiff
25  would get was a reconsideration by the insurance company as to
   whether it should continue to pay benefits, and thus reduce its
26  profits.

1  D.    **Plaintiff's Appeal to Defendant**

2        **1.    First Appeal**

3        On April 11, 2006, plaintiff "appealed" the determination,

4  emphasizing that "[c]hronic back pain is my primary problem . . .

5  anxiety is secondary."[8] Id. at 132-33. Smith sent a letter in

6  support of plaintiff's appeal. It stated that it was "inaccurate"

7  to interpret his earlier letter as support of a finding that

8  plaintiff could perform any nursing duties. Id. at 145. The letter

9  explained in some detail Smith's diagnosis of plaintiff's mental

10 health condition, concluding that she is "permanently . . . unable

11 to work" as a result. Id. at 146.

12       On April 18, 2006, defendant sent plaintiff a letter stating

13 that it had reviewed her claim file again and determined that the

14 decision to terminate long-term disability benefits should be

15 reversed. Id. at 199. Her claim was referred back to the claims

16 department. Id. This was based on a determination that defendant

17 had erred in concluding that plaintiff's condition did not preclude

18 her from performing her occupational duties. Id. at 207-208.

19       Defendant next conducted a "Medical / Vocational Review" of

20 plaintiff's claim file. Id. at 473. The review is asserted to be

21 ────────────────

22       [8]Prior to filing the appeal, on March 23, 2006, plaintiff
   called defendant and spoke to an employee there, expressing her
23 unhappiness with the decision. Id. at 156. The employee explained
   to plaintiff the "job vs. occupation" distinction for the award of
24 benefits past twenty-four months. Id. Plaintiff expressed that she
   was unable to perform acute care or any work in the hospital. Id.
25 According to the notes, plaintiff then "started to discuss nursing
   in Africa and her experiences and how that has impacted her ability
26 to work. [Plaintiff] confirmed that her impairment is more psyche
   than physical." Id.

targeted at the question of whether plaintiff's primary disabling condition is mental rather than physical and if it is clinically supported to conclude that plaintiff's back pain restricted to "medium" the level of physical exertion of which she was capable. Id. Upon review, the examiner concluded that plaintiff's disability was psychological rather than physical.  This decision was purportedly based on the medical information in her file, though it appears that it may be contrary to the bulk of information.

On August 14, 2006, defendant informed plaintiff that her benefits would terminate in May 2007 (twenty-four months from the date of the original claim), reiterating the limitations on benefits for impairments related to mental health conditions. Id. at 71-73. It again informed her of the appeal process. Id. at 73.

### 2.  Second Appeal

Plaintiff filed a letter of appeal of this decision. Id. at 129-30. In it, she stated that her "mental difficulties . . . are resolved" and that her "primary disability" is back pain. Id. at 129.

On September 12, 2006, plaintiff sent a letter in support of her appeal to defendant, stating that her "psych issues have resolved" and that she was no longer being treated by Brian Smith. She enclosed a letter from Dr. Cyphers, dated September 1, 2006, in which he explained that he had been treating plaintiff for two years for "orthopaedic concerns" and that she had developed chronic lower back pain. Id. at 399. He reiterated that as he had "previously stated in forms submitted . . . she is permanently

11

1   disabled as a result of her back condition." Id. at 400.

2       Defendant then arranged for plaintiff to undergo a Functional

3   Capacity Evaluation. Id. at 360. After conducting the tests, the

4   examiner concluded that plaintiff had difficulty performing some

5   tasks due to apparent low back pain, but was able to perform

6   sedentary work. Id. at 360-85.

7       Defendant also had conducted a Residual Employability Analysis

8   on January 5, 2007 based in part on a physical capacities

9   questionnaire completed the month prior. Id. at 284. It concluded

10  that based on her medical history and job history, she would be

11  able to perform a number of specified medical positions that

12  required only a sedentary exertion level. Id. at 285.

13      On January 8, 2007, defendant informed plaintiff that her

14  appeal was denied, based in part on the results of the Functional

15  Capacity Evaluation. Id. at 112.

16      **3.   Third Appeal**

17      On April 24, 2007, plaintiff's attorney wrote to defendant and

18  requested a review of the decision and asked for certain documents

19  from her claim file. Id. at 106. On May 10, 2007, defendant sent

20  plaintiff's attorney an acknowledgment of the request for review.

21  Id. at 105.

22      On July 11, 2007, plaintiff's attorney again wrote defendant,

23  reiterating the request for the claim file and stating that he had

24  also received no response on the request for review of the denial

25  of benefits. Id. at 52. On August 6, 2007, defendant sent

26  plaintiff's counsel the claim file and stated that it was still in

1    the process of reviewing the denial decision. Id. at 55. Due to its

2    delay in providing the claim file to plaintiff, however, defendant

3    would "leave the record open for a reasonable amount of time" to

4    allow plaintiff to respond to any of the materials in the file. Id.

5        The denial review was performed for defendant by Dr. Ajendra

6    Sohol, who reviewed the claim file and concluded that it supported

7    the conclusion that plaintiff could perform sedentary work. Id. at

8    16-21.

9        Plaintiff's attorney filed her appeal on November 8, 2007,

10   asserting that she was unable to perform sedentary work due to her

11   back pain and that, even if she were, nursing is not a sedentary

12   occupation. Id. at 31-45. On February 26, 2008, defendant notified

13   plaintiff's attorney that termination of benefits was appropriate

14   because she was not entitled to payments after twenty-four months

15   unless she was unable to perform any occupation for which she was

16   qualified and to the extent that her disability was contributed to

17   by a mental health condition that did not require her to be

18   hospitalized. Id. at 8-14.

19   **E.   Complaint and Procedural History**

20       Plaintiff filed her complaint on March 25, 2008. On August 29,

21   2008, plaintiff moved to remand in order for the plan administrator

22   to consider her recent diagnosis of Huntington's Disease. After

23   extensive briefing and a hearing on the motion, defendant

24   stipulated to remand and to augmentation of the record with

25   documents submitted by plaintiff regarding Huntington's Disease.

26   Accordingly, an order was issued to this effect on October 6, 2008.

The supplemented administrative record consisted of a declaration of nurse practitioner Teresa Tempkin offered by plaintiff, a copy of her medical evaluation at UC Davis Medical Center's Department of Neurology after her diagnosis of Huntington's Disease, a copy of the Merck Manual of Diagnosis and Therapy describing Huntington's Disease, a copy of a book from the Huntington's Disease Society of America entitled "Understanding Behavior in Huntington's Disease," and, finally, a letter from defendant to plaintiff's counsel on December 30, 2008, confirming its prior decision to deny benefits after review of her claim file in light of the new diagnosis.

In supplement of the record, plaintiff has submitted the apparent medical record from her visit to the UC Davis Medical Center Department of Neurology on July 11, 2008. Supplemental Administrative Record ("SAR") at 15. According to the document, plaintiff's reason for her visit was loss of balance and, at that time, she was diagnosed with Huntington's Disease. Id. In the review of plaintiff's medical history, the treating physician noted that plaintiff reported that beginning in late-2003, she began "experiencing cognitive disturbances such as short-term memory loss, decreased attention, and period of confusion . . . [which] [e]ventually . . . forced [her] to early retirement from her nursing position." Id. at 16. There is no indication of a review of her medical file. See id. at 15-24. The report notes that plaintiff reported that her other medical providers had found no reason for her cognitive problems, including through MRI testing,

1  and that she had been previously treated for back problems, as well

2  as other medical problems. Id. at 16.  The report did not relate

3  her previous cognitive problems to Huntington's Disease.

4      As noted, plaintiff also supplemented the record with the

5  declaration of Nurse Practitioner Teresa Tempkin. Id. at 12-14; see

6  also Decl. of David Allen In Support of Pl.'s Opp. to Def.'s Mot.

7  for Judgment ("Allen Opp. Decl.") ¶ 3 (describing that he was

8  referred to Tempkin as being the nurse practitioner assigned to

9  plaintiff). In her declaration, Tempkin confirmed that plaintiff

10 was diagnosed with Huntington's Disease on July 11, 2008. SAR at

11 11. It described the disease as manifesting a "loss of intellectual

12 faculties, . . . emotional disturbance . . . [and] depression." Id.

13 at 12; see also id. at 26-27 (Merck Manual describing similar

14 symptoms), 35-43 ("Understanding Behavior in Huntington's Disease,"

15 describing same). According to Tempkin, plaintiff was diagnosed

16 with having Stage 1 Huntington's Disease, characterized by

17 "marginal, or no, engagement in occupation, . . . or the person may

18 maintain a lower level of employment with assistance in one of the

19 other basic functions." Id. at 13. This may manifest with

20 difficulty performing multi-step tasks, shift attention between

21 tasks, and monitor one's time management. Id. at 13-14. The

22 physical, cognitive, and psychiatric symptoms of the disease,

23 however, vary among people. Id. Tempkin's declaration did not

24 contain any review of plaintiff's prior medical history. See id.

25 at 12-14.

26     Finally, the record includes the December 30, 2008 letter from

defendant to plaintiff's attorney, confirming the denial of her benefits past twenty-four months. Id. at 4-10. It contains an excerpt of a review of plaintiff's file by neurologist Dr. Craig Bogan in light of her diagnosis with Huntington's Disease. Id. at 6-8. Based on a review of her records, he confirmed that they supported the conclusion that in May 2007, plaintiff was capable of performing sedentary work. Id. at 7.

He also concluded, "Concerning the patient's more recent diagnosis of Huntington's Disease, it cannot be determined from the available records if she was having any clinical signs or symptoms of this disorder in 5/07." Id. He asserted that although Huntington's Disease is a genetic disorder, the age at which a person will first experience symptoms, the rate at which the symptoms progress, and the severity of the disorder vary among people. Id. He noted that, "Fluctuating depression, speech difficulty, and cognitive problems that [plaintiff] had between 2003 and 2005, all of which subsequently improved, would be atypical for Huntington's Disease. Once symptoms of this illness developed, they generally progressively worsen." Id. at 8. Finally, he observed that her symptoms at the time of her diagnosis in 2008 "were fairly subtle" and there was no indication that she had similar cognitive impairment in May 2007. Id.

As with all past reviews, defendant concluded that plaintiff had not demonstrated that she was incapable of performing the duties of "any occupation" for which she was qualified and, moreover, there was no evidence that she was experiencing the

16

1  symptoms of Huntington's Disease in May 2007. <u>Id.</u> at 8-9.

2    Upon plaintiff's counsel's multiple requests in January 2009,
3  <u>id.</u> at 3, defendant forwarded to plaintiff a letter from Dr. Bogan
4  identifying the contents of plaintiff's claim file that he relied
5  on in reaching his opinion. <u>Id.</u> at 1-2. This appears to have been
6  sent approximately three weeks after plaintiff counsel's first
7  request. <u>See</u> <u>id.</u> at 1-3.

8                          **II. STANDARD**

9    A district court reviews decisions of the insurer in ERISA
10  cases based on the record before it, essentially conducting a trial
11  on the record. <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084, 1094-95
12  (9th Cir. 199). The court then must make findings of fact and enter
13  judgment pursuant to Federal Rule of Civil Procedure 52. <u>Id.</u> at
14  1095. The standard of the district court's review of the decision
15  is discussed more fully, *infra*.

16                         **III. ANALYSIS**

17    The parties' dispute centers around two issues: what standard
18  of review the court should employ in evaluating the defendant's
19  decision to deny plaintiff's claim after twenty-four months and
20  whether its decision was correct in light of the facts and its
21  legal obligations to plaintiff. The court considers each of these
22  questions in turn.

23  **A.    Standard of Review**

24    The standard of review employed by district courts depends
25  first on whether the ERISA plan at issue conferred discretion on
26  the plan administrator to determine a participant's eligibility for

benefits or to interpret the terms of the plan. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (citing Firestone Tire & Rubber v. Bruch, 489 U.S. 101, 115 (1989)). If there is no such discretion in the plan, the administrative decision is reviewed de novo. Id. If discretion has been conferred, the administrator's decision is reviewed for abuse of discretion. Abatie, 458 F.3d at 963; Snow v. Standard Ins. Co., 87 F.3d 327, 332 (9th Cir. 1996) overruled on other grounds by Kearney v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999).

Even where the plan is not explicit in its grant of discretion, the court will find that the administrator's decision is discretionary so long as it "includes even one important discretionary element, and the power to apply that element is unambiguously retained by its administrator." Boque v. Ampex Corp., 976 F.2d 1319, 1325 (9th Cir. 1992); see also Snow, 87 F.3d at 330(collecting cases and recognizing that "[w]e have not been stingy in our determinations that discretion is conferred upon plan administrators").[9]

Here, the language of the plan explicitly confers discretion to the plan administrator.  The plan provides:

> The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties. [Reliance Standard Life Insurance Company] shall serve as the claims review

---

[9]Whether stingy or not, because it is in the plan's interest to limit the scope of review, it is the court's experience that the plan inevitably confers discretion on the administrator.

1             fiduciary with respect to the insurance policy and the
2             Plan.

3 IRC at 251.

4       The inquiry, however, is said  not to end there. Even if the

5 ERISA plan grants discretion to the administrator, the court must

6 employ a "more searching" standard of review when the court has a

7 reason to believe that the administrator did not act in accordance

8 with his fiduciary responsibilities. Id. at 331; Abatie, 458 F.3d

9 at 967-68. This exception often arises where there is evidence of

10 the administrator's conflict of interest in determining

11 eligibility. See Abatie, 458 F.3d at 966-68. This also arises where

12 the administrator violates the procedures mandated by ERISA in a

13 way that is "so flagrant as to alter the substantive relationship

14 between the employer and employee, thereby causing the beneficiary

15 substantive harm." Gatti v. Reliance Standard Life Ins. Co., 415

16 F.3d 978, 985 (9th Cir. 2005).

17       In Abatie, the Ninth Circuit explained the approach the

18 district court should take when confronted with circumstances that

19 call into question whether the plan administrator violated his

20 fiduciary duty to the claimant. It began with the understanding

21 that Firestone requires that the court employ an abuse of

22 discretion standard when an ERISA plan vests the administrator with

23 discretion, but "a review informed by the nature, extent, and

24 effect on the decision-making process of any kind of conflicts of

25 interest that appear on the record." 458 F.3d at 967. When, for

26 example, the administrator had an apparent conflict of interest but

19

1    there is no other evidence of "malice, self-dealing, or of a

2    parsimonious claims-granting history," then the court should

3    approach the administrator's decision with minimal "skepticism."

4    Id. at 968. However, when an administrator engages in "wholesale

5    and flagrant violations" of the procedural requirements of ERISA,

6    the court should review the administrator's decision de novo. Id.

7    at 971. The court approved of its prior cases, including Gatti,

8    holding that less severe violations of procedural regulations

9    trigger an abuse of discretion review. Id. at 972. "When an

10   administrator can show that it has engaged in ongoing, good-faith

11   exchange of information between the administrator and the claimant,

12   the court should give the administrator's decision broad deference

13   notwithstanding a minor irregularity." Id. (internal citations

14   omitted).

15       Abatie's holding, however, with regards to the use of a de

16   novo standard of review when the administrator has acted contrary

17   to its fiduciary duty appears to have been abrogated by the Supreme

18   Court last year in Metropolitan Life Insurance Company v. Glenn,

19   __ U.S. __ , 128 S. Ct. 2343 (2008). There, the Court held that when

20   an insurer acts as the plan administrator, this creates a conflict

21   of interest. Id. at 1248-50. That conflict, however, does not

22   "impl[y] a change in the *standard* of review, say, from deferential

23   to de novo review." Id. at 2350 (emphasis in original). Instead,

24   the administrator's conflict of interest should be considered as

25   a factor when considering whether it abused its discretion in

26

20

1  denying the claim. Id. at 2351.[10]

2      Here, plaintiff urges the court to find that several acts of

3  the administrator demonstrate an abandonment of its fiduciary

4  responsibilities, so as to warrant de novo review. These are its

5  failure to adhere to its own deadlines and ERISA regulations in

6  rendering the appeal, its having "continuously worked to deny

7  benefits," failure to adequately weigh the opinions of plaintiff's

8  treating physicians, and failure to provide plaintiff with a copy

9  of Dr. Bogan's report in conjunction with defendant's final denial

10 of plaintiff's claim. Pl.'s Mot. for Judgment at 15. The court

11 discusses each in turn.[11]

12      **1.   Defendant's Failure to Adhere to Its Own Procedures In**

13           **Resolving Plaintiff's Appeals**

14      Plaintiff urges the court to hold that defendant's failure to

15 adhere to its own stated procedures and deadlines demonstrates a

16 breach of its fiduciary duty such that de novo review should be

17 employed. She relies on Saffon v. Wells Fargo & Co. Long Term

18 Disability Plan, 522 F.3d 863 (9th Cir. 2008). Saffon, however,

19 cannot support so broad an argument. Indeed, that court did not

20 address procedural irregularities -- such as delayed decision-

21 making -- but the administrator's failure to provide the claimant

22      _____

23           [10]What other factors might bear upon abuse has not been
   articulated.  It appears to this court that determinations based
24 upon the medical record, but with a result contrary to the
   examining physician's conclusion, may well be another such factor.

25           [11]The court does so with some distaste.  Applying legal
   standards to what is clearly a stacked deck brings discredit to the
26 legal process.

1   with specific additional information it needed to evaluate her

2   claim, which it was required to do under Circuit precedent

3   interpreting the ERISA regulations. Id. at 870-72. Plaintiff has

4   directed the court to no authority , nor is the court aware of any,

5   that the administrator's failure to adhere strictly to its own

6   procedures evinces a breach of its fiduciary duty.

7       The case Jebian v. Hewlett-Packard Co. Employee Benefits Org.

8   Income Prot. Plan, 349 F.3d 1098 (9th Cir. 2003), is instructive

9   on this issue, however. There, the defendant had denied long-term

10  disability benefits to the plaintiff, who then appealed the

11  decision. Id. at 1102. The plan contained a provision that an

12  appeal would be "deemed denied" if the administrator did not

13  resolve it within sixty days nor inform the claimant within that

14  period of the need for an extension of another sixty days. Id.

15  After plaintiff filed his appeal, defendant did not respond with

16  a denial decision for approximately four months. Id. at 1103.

17      The court held that this warranted the use of de novo review

18  of the denial. Id. It reasoned that the plan vested the

19  administrator with discretion, but also set forth the limits of the

20  discretion by providing deadlines for certain actions. Id. at 1104.

21  In other words, a plan administrator who acts outside the scope of

22  its discretionary authority is not entitled to deferential review.

23  Id. Moreover, the court reasoned, by deeming the claimant's appeal

24  denied for the purposes of permitting the claimant to file suit and

25  then subsequently rendering an adverse appeal decision, the

26  administrator has effectively "sandbagged" the claimant. Id. The

22

1  court observed that in prior cases, it had held that a
2  administrator's failure to adhere to its own procedures bears on
3  the application of the abuse of discretion standard. Id. at 1105
4  (citing Blau v. Del Monte Corp., 748 F.2d 1348 (9th Cir. 1984)).
5  In light of this, the court reasoned, holding that procedural
6  irregularities could alter the standard of review was not
7  unwarranted, particularly in light of the Firestone Court's rule
8  regarding the degree of deference given to ERISA plan
9  administrators' decisions.

10      Even if Jebian remains good law after Metropolitan Life,
11  supra, there are facts that make the instant case distinguishable.
12  First, the deadlines of the appeal decision in the instant case
13  were not included in the policy, in which defendant's discretionary
14  authority was set forth. See ICR at 251. The policy created no
15  temporal limits to the exercise of defendant's discretion. See id.
16  The Jebian court relied strongly on the fact that "[t]he instrument
17  in this case does vest discretion, but same instrument . . . set
18  time boundaries within which that discretion must be exercised."
19  Jebian, 349 F.3d at 1103; see also Firestone, 489 U.S. at 111
20  (scope of administrator's discretion defined by the instrument
21  granting the discretion). Here, there was no such limit built into
22  defendant's discretionary authority.

23      Moreover, in defendant's denial letter to plaintiff, it did
24  not state that her appeal would be "deemed denied" if there was no
25  response within a certain time frame. Instead, the letter can be
26  read to be informative as to the period of time the defendant

23

1  typically intended to provide a response to plaintiff. See ICR at

2  113 ("Under normal circumstances, you will be notified . . . of the

3  final determination in 45 days . . . . If we determine that special

4  circumstances require an extension of time for processing, you will

5  ordinarily be notified of the decision no later than 90 days from

6  the date we receive your request for review.") This contrasts with

7  Jebian, where it had not only limited itself to the time periods

8  set forth in the plan, but provided that the appeal was deemed

9  denied if no decision was rendered during that time.   Similar

10 provisions did not exist in defendant's plan or appeals letter.

11      The court cannot conclude that Jebian requires it to employ

12 a de novo review standard on the basis that defendant's untimely

13 denial of the appeal. Nevertheless, the untimeliness should bear

14 on the court's review of the decision.

15      **2.   Defendant's Failure to Adhere to the Deadlines in the**

16          **ERISA Regulations In Resolving Plaintiff's Appeals**

17      Plaintiff urges the court to hold that the defendant taking

18 110 days to respond to her November 2007 appeal violated ERISA so

19 flagrantly as to result in the use of a de novo standard of review

20 of the administrator's decision. ERISA regulations require that

21 employee benefit plans "establish and maintain reasonable

22 procedures governing . . . appeal of adverse benefit

23 determinations." 29 C.F.R. § 2560.503-1(b). In cases where the

24 claimant appeals the administrator's decision regarding a

25 disability claim, as is the case here, the administrator must

26 render a decision within forty-five days of the receipt of the

24

1   appeal. Id. § 2560.503-1(f)(i)(3)(i). This period may be extended

2   by up to sixty days if necessary for reasons beyond the

3   administrator's control and if notice is given to the claimant. Id.

4   Accordingly, because plaintiff submitted her appeal on November 8,

5   2007 and there was apparently no extension sought by the

6   administrator, the administrator's deadline to respond was December

7   23, 2007.

8       The dispositive question is whether and to what extent this

9   failure to adhere to the ERISA regulations affects the deference

10  the court gives to the administrator's decision. This question

11  appears not to have been squarely addressed by the Ninth Circuit

12  since the revision of ERISA regulations in 2002. Prior to 2002, the

13  regulations provided that, if the administrator failed to adhere

14  to the time limitations for responding to claims, the claim was

15  deemed denied. See 29 C.F.R. § 2560.503-1(f)(3) (2002). This

16  language was altered so that, after January 1, 2002, if the

17  administrator fails "to . . . follow claims procedures consistent

18  [with the regulations], a claimant shall be deemed to have

19  exhausted administrative remedies" for the purpose of bringing

20  suit. Id. § 2560.503-1(l).

21      The Ninth Circuit has held that, under the pre-2002

22  regulations, failure to adhere to the deadlines set forth in the

23  regulations will not alone warrant the use of a de novo standard

24  of review.[12] Gatti, 415 F.3d at 978. Instead, the "deemed denied"

25

26      [12]Although Gatti was decided in 2005, it considered a claim
    filed prior to the enactment of the new regulations and thus was

language of the earlier regulations simply provided beneficiaries

with a final decision, permitting them to file suit.[13] Id. at 983.

The court reasoned that this interpretation was similar to that

used in other statutory contexts and by at least one Justice of the

Supreme Court. Id. at 983 & n. 3 (citing Biodiversity Legal Found.

v. Baley, 309 F.3d 1166, 1178 (9th Cir. 2002) and Mass. Mut. Life

Ins. Co. v. Russell, 473 U.S. 134, 144 (1985) (Stevens, J.,

concurring).

Although the Gatti court was interpreting the pre-2002

regulations, it considered in dicta the effect 2002 amendments as

well. It concluded that the amendments confirmed the court's

understanding that the "deeded denied" language only operated to

allow the claimant to file suit and did not alone affect the

standard of review.[14] Id. at 983. The change of the language from

"deemed denied" to "deemed to have exhausted administrative

remedies" suggested that an administrator's failure to adhere to

---

analyzed under the pre-2002 amendments. 415 F.3d at 978 n. 1.

    [13]The court distinguished Jebian, 349 F.3d 1098, which had
held that where the plan itself had set forth deadlines for the
administrator to act, failure to adhere to these deadlines would
cause a court to employ de novo review, unless there was evidence
of good faith attempt to comply with the procedures. Gatti, 415
F.3d at 982. ("The Jebian decision recognizes that there will be
cases where benefits decisions are made in violation of the
regulations alone, and explicitly leaves this issue open.").

    [14]Moreover, as discussed above, Metropolitan Life appears to
disapprove of use of a de novo standard of review based solely on
the administrator's failure to adhere strictly to his fiduciary
duty; instead, it indicates that this should be considered when
weighing whether the administrator abused its discretion.
Metropolitan Life, 128 S. Ct. at 2350.

regulatory deadlines was intended to only affect the claimant's ability to bring suit. Id. The court concluded that "[n]othing in the history of ERISA or its regulations, nor in the precedent that binds us, indicates that the 'deemed denied' language is a temporal restriction on the administrator's discretion." Id. at 984.

Since the 2002 amendment, other courts have held that the administrator's failure to adhere to the regulations' deadlines does not alone merit the use of a de novo standard of review. See Peterson v. Federal Exp. Corp. Long Term Disability Plan, No. 05-1622, 2006 WL 1495307, at *6-*7 (D. Ariz. May 24, 2006) (concluding that the Gatti rule most likely applies to the 2002 amendments and therefore that the plan administrator's failure to timely render a decision did not trigger de novo review); Neathery v. Chevron Texaco Corp. Group Acc. Policy No. OK 826458, No. 05-cv-1883, 2006 WL 4690902, at *8 (C.D. Cal Jul. 31, 2006) (same); Riffey v. Hewlett-Packard Co. Disability Plan, No. 05-1331, 2007 WL 946200, at *12-*14 (E.D. Cal. Mar. 27, 2007) (Damrell, J., holding that administrator's failure to timely reply to claimant's appeal was not a serious enough violation to warrant de novo review, relying on Gatti).

Instead, those courts have said that the administrator must show a flagrant disregard for the procedures of ERISA in a way that substantially injured the claimant. Gatti, 415 F.3d at 985; see also Abatie, 458 F.3d at 971 ("[I]f the plan administrator's procedural defalcations are flagrant, de novo review applies."). This comports with this circuit's apparent strict approach to

allegations that the administrator operated with a conflict of interest. In those cases, an apparent conflict is not enough to justify the court using a de novo standard of review. Rather, the claimant must show with "material, probing evidence" that the administrator's "self-interest caused a breach of [his] fiduciary responsibilities to the beneficiary." Abatie, 458 F.3d at 963.[15]

Here, under these cases, the administrator's inaction appears not severe enough to warrant the use of the de novo standard of review by itself. According to the plaintiff's evidence, the administrator was approximately two months late in responding to plaintiff's appeal, per the ERISA regulations. Based on the two-month delay alone, the court cannot conclude that the administrator acted in a way that was "so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm," Gatti, 415 F.3d at 985, even if that remains a proper approach under Metropolitan Life.

### 3. Defendant Having "Continuously Worked to Deny Benefits" to Plaintiff

Plaintiff next asserts that defendant "continuously worked to deny benefits" to her, directing the court to evidence of virtually every action the defendant has taken in the course of reviewing her claim and denying her appeals.  Of course, continued denial may prove no more than that plaintiff's case is unworthy of benefits.

---

[15]One cannot help but wonder whether any facts suffice to end the bias in favor of the plan.  The fact is that in every case before a court two things are true:  there is a conflict and plaintiff was denied benefits.

1   It cannot by itself demonstrate a justification for de novo review.

2       **4.   Defendant's   Asserted   Failure   to   Adequately   Weigh**

3           **Plaintiff's Physicians' Opinions**

4       Next, plaintiff contends that a de novo standard of review

5   must be employed due to defendant's failure to give adequate weight

6   to her treating physicians' opinions, relying on the <u>Saffon</u> court's

7   reference to Social Security cases' relevance in resolving cases

8   under ERISA. <u>Saffon</u>, 522 F.3d at 872-73.  In citing the passage

9   from <u>Saffon</u>, however, plaintiff omits the footnote within it, which

10  states

> While the rules and presumptions of our Social Security
> case law do not apply to ERISA benefits determinations,
> <u>see</u> <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822
> . . .(2003), our Social Security precedents are relevant
> for the factual observation that disabling pain cannot
> always be measured objectively-which is as true for
> ERISA beneficiaries as it is for Social Security
> claimants.

16  <u>Id.</u> at 873 n.3. In <u>Nord</u>, the Court held that the presumption in

17  Social Security cases that treating physicians' opinions must be

18  given deference does not apply in the ERISA context. Nonetheless,

19  it seems to this court not to be irrelevant when the insurer

20  reviews the record made by the plaintiff's doctors but comes to a

21  contrary opinion.

22      **5.   Defendant's Failure to Provide Plaintiff a Copy of the**

23          **Reviewing  Physician's  Report  After  Her  Final  Appeal**

24          **Denial**

25      Finally, plaintiff urges the court to utilize a de novo

26  standard of review due to defendant's failure to provide her with

1  a copy of Dr. Bogan's report, which was relied on and cited in

2  defendant's final denial of plaintiff's claim appeal. Plaintiff

3  asserts that, "Since Reliance relied almost exclusively on the

4  report of Dr. Bogan to again deny the claim, the specific wording

5  of his report and the documents he reviewed are pivotal." Pl.'s

6  Mot. for J. at 16. Plaintiff relies on Booton v. Lockheed Med.

7  Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997) and Saffon.

8  Neither Booton or Saffon provide direct support for plaintiff's

9  position, although both recognize the need for meaningful

10 communication.

11      Additionally, the defendant asserts in its opposition to

12 plaintiff's motion that Dr. Bogan's report has been provided to

13 plaintiff. Def.'s Opp'n to Pl.'s Mot. for J. at 8.  There is no

14 indication in the supplemental record for that nor has defendant

15 tendered any additional evidence of that.  It is important,

16 nonetheless, to recognize that in Metropolitan Life, 128 S. Ct. at

17 2348; Firestone, 489 U.S. at 115, the high court mandated

18 deference. That standard may only be abandoned in favor of a de

19 novo review standard "[w]hen an administrator engages in wholesale

20 and flagrant violations of the procedural requirements of ERISA,

21 and thus acts in utter disregard of the underlying purpose of the

22 plan as well." Abatie, 458 F.3d at 971.

23      Plaintiff has asserted several grounds for use of de novo

24 review instead of an abuse of discretion standard, none of which

25 alone suffices to justify use of that standard.  The court is of

26 the view that if it was writing on a clean slate, de novo review

1 might well be justified. Taken cumulatively, however, the court
2 cannot find "wholesale and flagrant violations" of ERISA's
3 requirements so as to indicate an "utter disregard" of the plan's
4 purpose to provide benefits to its beneficiary. See Abatie, 458
5 F.3d at 971.

6      The failings by defendant are not insignificant, particularly
7 given plaintiff's compelling personal interest in pursuing her
8 claim and having defendant act fairly and openly with her in the
9 course of its decision-making and when explaining the basis of its
10 denial. See Booton, 110 F.3d at 1463; Saffon, 522 F.3d at 870. The
11 administrator is a fiduciary to the beneficiary and, as such, owes
12 a "special duty of loyalty" to her. Metropolitan Life, 128 S. Ct.
13 at 2347. Nevertheless, the court is bound by precedent that has
14 made clear that only extreme, flagrant instances of departure from
15 its fiduciary role will an administrator's decision be reviewed de
16 novo. Abatie, 458 F.3d at 971. The various omissions or neglect by
17 defendant do not rise to that level. The court therefore is bound
18 to apply an abuse of discretion standard to defendant's
19 determination.

20 **B.   Whether Defendant Abused Its Discretion**

21      Relying on trust law, as the Firestone Court did, the Court
22 of Appeals has held that an administrator abuses its discretion
23 when its denial of benefits was "unreasonable." Clark v. Wash.
24 Teamsters Welfare Trust, 8 F.3d 1429, 1432 (9th Cir. 1993);
25 McDonald v. Pan Am. World Airways, Inc., 859 F.2d 742, 744 (9th
26 Cir. 1988); see also Firestone, 489 U.S. at 111. When the plan

1  administrator is also the entity that funds the benefits, a
2  conflict of interest exists, which the court should consider as a
3  factor when determining whether the administrator abused its
4  discretion in denying benefits. Metropolitan Life, 128 S. Ct. at
5  2348-50. Where, the administrator is not the beneficiary's employer
6  but the insurer (as here), it is said that "the conflict question
7  is less clear." Id. at 2349. An insurer is said to have less of an
8  incentive to deny claims than would an employer, but the cost-
9  saving interests of the employer may infect an insurance company
10 by encouraging it to keep its rates low by denying claims. Id. at
11 2349-50. Nonetheless, collecting premiums and not paying benefits
12 directly effects the insurance company's bottom line.  Given the
13 restrictions on review, the plan administrator's  fiduciary duty
14 to "provide a full and fair review of claim denials." Id. at 2350
15 (citing Firestone, 489 U.S. at 113), appears no more than verbiage.

16     Here, as in Metropolitan Life, "[t]he record says little about
17 [defendant's] efforts to ensure accurate claims assessment," which
18 could include, for example, "walling off claims administrators from
19 those interested in firm finances, or . . . imposing management
20 checks that penalize inaccurate decisionmaking." Id. at 2351.

21     In the instant case there were some procedural problems that
22 also call into question the fidelity of defendant to plaintiff in
23 evaluating her claim. As identified above, the appeal decision in
24 February 2008 was rendered approximately twenty days after the
25 deadline defendant had described in its earlier letter to
26 plaintiff. See AR at 8-15, 113. Although defendant offered to

provide plaintiff her claim file or other documents on request, plaintiff's counsel made this request several times over the course of a few months, waiting 104 days to receive it. See id. at 52, 55, 106, 112-13. Finally, as discussed above, defendant did not provide to plaintiff the complete report from Dr. Bogan, on which defendant relied in denying her final appeal. See SAR at 1-10.

While these are not unimportant defects in the defendant's procedures, defendant did take some steps to mitigate their effect on plaintiff. As described above, although Dr. Bogan's full report was not provided to plaintiff, a two-page excerpt of it was included in the final claim denial letter and Dr. Bogan, through defendant, later provided plaintiff a description of the documents in her claim file on which he had relied. Id.   While hardly meeting a desired level of transparency and candor, nevertheless, defendant's conduct does not rise to the level of a flagrant disregard under the cases.

The same can be said of defendant's delay in providing a copy of plaintiff's claim file to her upon request. While the appeal decision did not state a deadline by which it would provide a claims file or other documents upon request See id. AR at 112-13. It is reasonable to expect that defendant would provide requested documents with reasonable promptness and a 104-day delay as excessive. Nonetheless, thereafter defendant then took measures to mitigate the effect of this delay by keeping plaintiff's claim file open to permit her to respond to the elements of the file. See id. at 55.

1    Finally, the twenty day delay in rendering a final decision

2  cannot demonstrate that the administrator abused its discretion.

3  Nonetheless, it is important, in the court's estimation, to view

4  this delay in the context of defendant's entire course of conduct

5  with the plaintiff. It notified her of the planned termination of

6  her benefits more than a year in advance. AR at 75. Her first

7  appeal was filed in April 2007 and resolved tentatively in her

8  favor a week later, but then the denial was confirmed four months

9  later after a Vocational Review was performed. Id. at 71-73, 473.

10  This process was completed more than six months before her benefits

11  were due to terminate. See id.

12    She appealed this decision almost immediately and defendant

13  requested plaintiff undergo another evaluation to determine her

14  physical capacity. Id. at 129-30, 360. Approximately four and a

15  half months later, it denied her appeal again. Id. at 112. This

16  occurred approximately two months before her benefits were due to

17  terminate.

18    She appealed again in April 2007 through her attorney, a month

19  after her benefits terminated. Id. at 106. This is the decision

20  that was rendered in 110 days, approximately twenty days after

21  defendant's ninety-day, self-imposed deadline. Id. at 8-14.

22    The review of this history yields two competing observations.

23  First, the twenty-day delay in resolving her third appeal was not

24  unusual per defendant's prior course of conduct and, in fact, was

25  more timely than defendant's prior determinations. On the other

26  hand, during each of the periods between the time when plaintiff

34

1   sent her appeal letters and the decisions were rendered, defendant

2   appears to have been in contact with plaintiff, at least to request

3   and obtain various evaluations. Moreover, by notifying plaintiff

4   more than a year in advance of her impending termination of

5   benefits and allowing the appeals process to commence then,

6   defendant considered and rendered decisions on two rounds of

7   appeals prior to the benefits' termination. It appears that

8   defendant's delays do not compel the court to take a more skeptical

9   view of the claim denial, even taking the conflict of interest into

10  account. See Abatie, 458 F.3d at 968-69; Saffon, 522 F.3d at 871-

11  72.

12      Finally, the court must consider the factual justification for

13  the denial of plaintiff's claim. A court should look skeptically

14  on denials that are offered for different reasons over time or that

15  rely on selective evidence from the claim file or that are based

16  on an incomplete set of facts, where the administrator has not

17  sought out additional information. Abatie, 458 F.3d at 974; Saffon,

18  522 F.3d at 873; Booton, 110 F.3d at 1463. An administrator also

19  abuses its discretion if its interpretation of the plan is

20  unreasonable. McDonald, 859 F.2d at 744.

21      Here, no such flaws are apparent. The defendant's denial

22  notices to plaintiff were written in clear language and described,

23  often in detail, the facts on which defendant had relied in denying

24  her claim and their relationship to the relevant provisions of her

25  policy. See ICR at 8-14, 71-73, 75-77, 112-14; SAR at 8-10.

26  Defendant appears to have interpreted the relevant provisions of

1   the policy -- concerning long-term disability benefits eligibility

2   for disabilities contributed to by "mental disorders" and the "any

3   occupation" limitation -- per their plain language. See ICR at 247;

4   see also McKenzie v. Gen. Tel. Co. of Cal., 41 F.3d 1310, 1317 (9th

5   Cir. 1994) ("the language of the 'any occupation' standard is not

6   searching"), overruled on other grounds by Saffon, 522 F.3d at 872

7   n.2.

8       The denials were also based on an apparently complete review

9   of the record, as well as additional information and evaluations

10  the defendant sought at each denial. See, e.g., ICR 77-78, 112,

11  315-16, 360, 473, 485. This distinguishes the case from Saffon,

12  where the court held that the administrator improperly relied on

13  certain pieces of evidence and not others and failed to seek out

14  additional information it needed to make its decision. See Saffon,

15  522 F.3d at 870-72.

16      Finally, its determination was not unreasonable. In brief,

17  plaintiff's initial claim was based on back pain and anxiety and

18  depression, although the latter was characterized as secondary.

19  ICR at 273, 503-504. Despite this characterization, there was

20  consistent evidence throughout her file that her emotional stress

21  was an element in her asserted disability. See id. at 146, 156,

22  275, 507, 521, 549, 585. Based on this, it was not unreasonable

23  for defendant to conclude that, to the extent that her disability

24  was contributed to by a mental state of anxiety or depression,

25  it was not covered beyond twenty-four months (unless plaintiff

26  was hospitalized at the time, which she has not asserted nor does

1   the record indicate was the case). See id. at 257.[16]

2       Finally, the court notes that defendant's determination

3   based on the additional evidence relating to Huntington's Disease

4   was not unreasonable. Plaintiff supplemented the record with

5   evidence of her diagnosis at Stage 1 of Huntington's Disease, as

6   well as general information about the disease, including the

7   symptoms at that stage. SAR at 12-90. Nonetheless, the diagnosis

8   itself does not refer to plaintiff's emotional stress in the

9   years prior, but rather "cognitive disturbances," SAR at 16,

10  which appear never to have been evidenced in any earlier medical

11  document that is part of the record.

12      Moreover, Teresa Tompkin's declaration described only in

13  generalities the possible symptoms a person with plaintiff's

14  diagnosis might experience, including diminished ability to work,

15  although she did not describe plaintiff's own symptoms or their

16  effect on her ability to work. Id. at 13-14. Plaintiff tendered

17  no evidence of any medical professional's review of her medical

18  file or other evidence that would link her earlier symptoms that

19  formed the basis of her claim to her recent diagnosis. Defendant,

20  however, did have such an evaluation performed by Dr. Bogan, who

21  concluded that her past symptoms and their variability were

22  atypical as symptoms of Huntington's Disease and that there was

23  no evidence that she had experienced other symptoms of

24  Huntington's Disease in May 2007. Id. at 8. Based on all of this

25

26      [16]Again it is not clear to the court the emotional distress
    caused by the physical disability is not covered.

37

1  evidence, the court cannot conclude that defendant's denial of
2  plaintiff's appeal in December 2008 was unreasonable. <u>See</u> <u>Jordan</u>
3  <u>v. Northrop Grumman Corp. Welfare Benefit Plan</u>, 370 F.3d 869, 880
4  (9th Cir. 2004) ("That a person has a true medical diagnosis does
5  not by itself establish disability."), <u>overruled on other grounds</u>
6  <u>by</u> <u>Abatie</u>, 458 F.3d at 969.

7                          **IV. CONCLUSION**

8        For  the  reasons  stated  herein,  plaintiff's  motion  for
9  judgment  is  DENIED  and  defendant's  motion  for  judgment  is
10  GRANTED. Judgment is entered in defendant's favor.

11       The Clerk is directed to close the case.

12       IT IS SO ORDERED.

13       DATED:  August 13, 2009.

14

15

16                          LAWRENCE K. KARLTON
17                          SENIOR JUDGE
                            UNITED STATES DISTRICT COURT
18

19

20

21

22

23

24

25

26